UNITED STATES DISTRICT COURT.

DISTRICT OF CONNECTICUT

ANGEL CINTRON,                          :
      Plaintiff,                        :
                                  :
v.                                      :          No. 3:14cv1224 (DJS)
                                  :
ATTICUS BAKERY, LLC,                    :
d/b/a CHABASO BAKERY,                   :
      Defendant.                        :

## MEMORANDUM OF DECISION

The plaintiff, Angel Cintron ("Cintron"), brings this civil rights action against the defendant, Atticus Bakery, LLC, d/b/a Chabaso Bakery ("Atticus"), alleging: (1)  discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count One); (2) hostile work environment in violation of Title VII (Count Two); (3) discrimination on the basis of sex in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a)(1) ("CFEPA") (Count Three); (4) aiding and abetting discrimination in violation of Conn. Gen. Stat. § 46a-60(a)(5) (Count Four); and (5) invasion of privacy by unreasonable intrusion upon the seclusion of another (Count Five).

The defendant has filed a motion for summary judgment on all counts of the plaintiff's complaint pursuant to Fed. R. Civ. P. 56.  For the reasons stated herein, the defendant's motion for summary judgment is granted in part and denied in part.

# I.   FACTS

Review of both parties' memoranda, affidavits, declarations, and Local Rule 56(a) statements submitted in support of and in opposition to the motion for summary judgment discloses the following:[1]

Cintron, a male over the age of 40, began working at Atticus on or about June 17, 1997 and worked there for 15 years until June 30, 2012. Cintron was initially hired as a driver, but at the time his employment at Atticus ended, he held the position of Production Manager. As Production Manager, Cintron supervised approximately sixteen male and female employees. His duties as Production Manager included, but were not limited to, setting up production, confirming the completion of packages, working with outside vendors to schedule deliveries, checking for discrepancies between orders, and assisting managers and supervisors in other departments, if necessary. During the time he held the position of Production Manager, Cintron's immediate supervisor was initially John Ferreira ("Ferreira") and then Christopher Pustizzi ("Pustizzi"). All managers and supervisors at Atticus reported to Charles Negaro Sr. ("Negaro Sr."), who is the founder of Atticus, and Charles Negaro Jr. ("Negaro Jr."), the Director of Operations/Plant Manager of Atticus. At all times pertinent to this action Negaro Sr. and Negaro Jr. were the only individuals with the power to hire and fire Atticus employees.

During the majority of Cintron's employment at Atticus, he was happy with his job. Cintron's last employee evaluation, which took place on January 24, 2012, indicated that he performed his job in a satisfactory and proficient manner. Further, Cintron's supervisor, Pustizzi,

---

[1] Unless otherwise noted, the following material facts are undisputed by both parties, and recounted in the light most favorable to the nonmovant, drawing all reasonable inferences in favor of the nonmovant. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

stated that "Mr. Cintron's job performance was always done in a professional manner." (Doc. #33-7, at 3, ¶ 15).

At all times relevant to this action, the Atticus Employee Handbook contained a Non-Harassment policy stating that "[u]nwelcome sexual advances and other verbal or physical conduct of a sexual nature are serious violations of our policy and will not be condoned or permitted." (Doc. #28-1, at 6). That policy also stated that "[a]ll complaints of sexual harassment will be promptly and confidentially investigated." (*Id.*). Cintron was aware of and had read the Non-Harassment policy during the time he was employed at Atticus.

Between April and June 2012 two investigations of alleged inappropriate behavior occurred at Atticus. Cintron was interviewed during the course of both investigations and claims that he endured repeated questioning and harassment from coworkers and management after the first investigation and during the second investigation. Each investigation will be discussed below.

In April 2012 Atticus became aware of the possibility that male supervisors were engaging in sexually harassing behavior toward female employees. Through its attorneys, Atticus engaged Nicholas Daukas ("Daukas") of the firm KardasLarson LLC, Human Resources Solutions to investigate this matter. Daukas' investigation consisted of interviewing a number of Atticus employees, including Cintron, about possible inappropriate behavior.  Cintron is mentioned in Daukas' investigative report as a supervisor "alleged to have committed inappropriate behavior and/or sexual harassment toward female employees." (Doc. # 28-1, at 15). That report goes on to conclude that, "Although the behavior that Cintron was alleged to have committed could not be corroborated, the perception of him by employees is not professional in this regard." (*Id.*). The report further concluded that a different supervisor had

3

engaged in sexually harassing behavior toward female employees and Atticus terminated that supervisor's employment.

Cintron claims that after being interviewed by Daukas in connection with the first investigation, he was constantly questioned and harassed by other employees and management asking if he was the one being accused of sexual harassment and why he was being questioned.[2] During the course of the first investigation, one of the Atticus employees interviewed by Daukas indicated that Cintron "is nice to the female employees and brings them beverages on their breaks." (*Id.* at 14). Atticus subsequently issued a written warning to Cintron concerning his practice of buying coffee for some of his coworkers. According to the Atticus Human Resources Manager, Amy Flood ("Flood"), "[i]t is not appropriate to buy certain people gifts or coffee . . . and leave others out, that could be seen as favoritism . . . ." (Doc. # 33-4, at 118:24-25, 119:1). According to Cintron, buying coffees for staff was "something that everybody practiced within the management." (Doc. # 33-2, at 102:10-11). He also testified at his deposition that Flood "had it in for me" ever since he declined her invitation when she first started at Atticus to serve on her work-related health committee. (*Id*. at 102:13-16).

In June 2012, Cintron began to have a personal relationship with Marsabelle Villatoro ("Villatoro"), an Atticus employee who was directly supervised by Cintron. Also in June 2012, Flood received a call from Cintron's wife, Yvette Cintron, informing Flood that Cintron was having a personal relationship with Villatoro.[3] In response to this information, Flood once again contacted Daukas to conduct an investigation into the relationship between Cintron and

---

[2] Daukas' report identifies twelve Atticus employees besides Cintron who were interviewed during the course of the first investigation.

[3] At his deposition, Cintron stated that while he refers to Yvette Cintron as his "ex-wife," due to financial concerns they have never divorced. He indicated that Yvette is disabled and would risk losing her home if they divorced.

Villatoro. Before the second investigation started, no one at Atticus had ever questioned Cintron about his relationship with Villatoro. Additionally, Villatoro had never indicated to Cintron that his behavior toward her was unwelcome, and had never complained to Human Resources Manager Flood about Cintron's relationship with her.

On June 12, 2012, the day of the second investigation, Daukas interviewed Cintron in Negaro Jr.'s office while Flood separately questioned Villatoro in a conference room. Daukas asked Cintron if he was having a personal relationship with someone who worked at the bakery. Cintron responded by saying, "it's my private life and whatever I do outside of the bakery is my business, . . . it's my private business, you should not be asking me about my private business." (Doc. # 33-2, at 129: 9-10, 13-15).  According to Cintron, the conversation lasted only a few seconds. Daukas states that the conversation lasted approximately five minutes. Regardless of the exact length of the short interview, it is undisputed that after Daukas asked Cintron whether he was having a personal relationship with another Atticus employee, Cintron told Daukas he had nothing to say to him and got up and left the room.

After being questioned by Daukas, Cintron went directly to Pustizzi's office. Cintron told Pustizzi that he was being harassed and that the questioning was an invasion of his privacy. The parties dispute whether Cintron stated to his supervisors that he might resign or whether he actually resigned. However, the Court must construe all genuine factual disputes in Cintron's favor. *See Simpson v. City of New York*, 793 F.3d 259, 262 (2d Cir. 2015) ("the district court [is] bound to consider the facts in the light most favorable to . . . the non-moving party"). According to Cintron, while in a distressed state he said to Pustizzi and Negaro Jr., "if this [harassment] keeps up, I will be handing in my two weeks' notice." (Doc. # 33-2, at 130:17-18). At that point, Pustizzi and Negaro Jr. told Cintron to "think about it and come back, you're acting irrational . . .

." (*Id*. at 131:10-11). Cintron then left Pustizzi's office and went back to work. Two or three days later, Cintron went back to Pustizzi's office. Pustizzi asked Cintron how he was doing, and Cintron responded by saying, "I'm still upset, this shouldn't happen, you know, I didn't do anything wrong . . .  and I said . . .  I'm not going anywhere, I rescind whatever I said. He goes, fine, just get back to work." (*Id*. at 132:2-6).

After the second investigation Atticus employees kept asking Cintron why he and Villatoro had been questioned and whether he had sexually harassed somebody. Cintron approached Pustizzi and asked him to speak to the employees about the situation "but it just kept on." (*Id*. at 198:1). Cintron himself told employees that he didn't want to talk about the second investigation. At that point the employees stopped directly asking him about the situation, "but they were talking about it." (*Id*. at 197:13-14). At some point between June 12, 2012, and June 29, 2012, Villatoro was transferred to a different department within Atticus "to avoid any conflicts." (*Id*. at 135:13-14).

On June 29, 2012, Negaro Jr. told Cintron that he was accepting Cintron's two weeks' notice and that Cintron had to leave the premises. Cintron states that Negaro Jr. told him that "due to the [second] investigation," his employment was being terminated. (*Id*. at 132:25). Rocio Pinos ("Pinos"), a female employee, was subsequently promoted and took over Cintron's position after he was terminated.

Cintron alleges that female supervisors at Atticus had personal relationships with male subordinates, but were not terminated or disciplined because of those relationships. First, Cintron mentions Maribel Rodriguez (hereinafter "Rodriguez"), a female supervisor who was married to another employee, Gabino Aguilar (hereinafter "Aguilar"). Atticus management knew about Rodriguez's relationship with Aguilar but never investigated or disciplined her for having a

relationship with another employee. According to Atticus, "Rodriguez is married to another employee of Atticus who does not now report nor at any relevant time has he reported to her." (Doc. # 28-1, at 4, ¶ 21). According to Cintron, however, for the majority of the time he worked at Atticus, Aguilar worked in the same department as Rodriguez and reported to her.

Second, Cintron claims that Hydee Vazquez ("Vazquez"), a female supervisor, was neither disciplined nor investigated for having a relationship with a male employee, Albert Santiago ("Santiago"). It is undisputed that Vazquez and Santiago worked in different departments. Cintron does not know whether Atticus had knowledge of the relationship between Vazquez and Santiago. Atticus claims it had no knowledge of that relationship.

## II.    DISCUSSION

Cintron alleges that Atticus' conduct violated Title VII and CFEPA. Specifically, Cintron claims that: (1) he was wrongfully terminated and discriminated against in violation of Title VII and CFEPA, and (2) he was subjected to a hostile work environment in violation of Title VII. Cintron also alleges that Atticus supervisors aided and abetted its discriminatory conduct and that Atticus invaded his privacy by unreasonably intruding upon his seclusion. Atticus has moved for summary judgment on all counts of Cintron's complaint. The Court hereby **DENIES** Atticus' motion on Cintron's sex discrimination claims under Title VII and the CFEPA and **GRANTS** Atticus' motion on all remaining counts. The Court shall discuss Cintron's claims seriatim in the context of the summary judgment standard.

### A.  Summary Judgment Standard

A motion for summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one whose resolution will affect the ultimate determination of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  The Court "accept[s] as true facts that [are] undisputed by the parties, and resolve[s] disputed facts in favor of the non-moving plaintiff where there [is] evidence to support his allegations." *Sousa v. Roque*, 578 F.3d 164, 166 n.1 (2d Cir. 2009). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Summary judgment is appropriate if, after discovery, the nonmoving party has "failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (internal quotation marks omitted).  Upon the moving party satisfying that burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256. However, mere conclusory statements, conjecture, surmise, or unsubstantiated allegations are insufficient to defeat a well-founded motion for summary judgment. *See Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995).

The Second Circuit has emphasized that "trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue*." Chertkova v. Connecticut General Life Ins. Co*., 92 F.3d 81, 87 (2d Cir. 1996). Accordingly, the Court must carefully scrutinize "relevant depositions, affidavits, and [other] materials . . . for circumstantial evidence that could support an inference of discrimination." *Id.*

### B. Sex Discrimination in Violation of Title VII

Title VII provides that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In this case Cintron claims that Atticus intentionally discriminated against him based on his gender by treating him less favorably than it treated similarly situated female supervisors. Cintron presents no direct evidence that his termination was based on discriminatory animus toward him based on his gender. Where the Court finds no direct evidence "that a workplace policy, practice, or decision relies expressly on a protected characteristic," the Court uses "the burden-shifting framework set forth in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]." *Young v. UPS*, 135 S. Ct. 1338, 1345 (2015).

Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination by showing that: "(1) [he] is a member of a protected class; (2) [he] is qualified for the position; (3) [he] suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000). The plaintiff's burden of establishing a

prima facie case of discrimination is "*de minimis,*" *Chambers v. TRM Copy Centers Corp*., 43 F.3d 29, 40 (2d Cir. 1994).

If the plaintiff can establish a prima facie case, a "presumption of unlawful discrimination arises." *Chertkova*, 92 F.3d at 87. The burden of production then shifts to the defendant to "articulate a legitimate reason for the challenged employment decision . . . ." *Id.* The defendant's burden "is one of production, not persuasion," and "can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 142, (2000) (internal quotation marks omitted). Moreover, the employer is not required to persuade the Court that its conduct was motivated by its proffered reason; "rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998).

If the defendant satisfies its burden of production, the plaintiff then carries the burden of producing "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks and alterations omitted). For Title VII claims, "the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff [must be] sufficient to sustain a reasonable finding that [his] dismissal was motivated at least in part by [sex] discrimination." *Adamczyk v. New York State Department of Correctional Services*, 474 F. App'x 23, 25 (2d Cir. 2012) (internal quotation marks omitted).

      1. Plaintiff's Prima Facie Case Under the *McDonnell Douglas* Test

It is undisputed that Cintron satisfies the first two prongs of the prima facie case: he is a member of a protected class (male) and was qualified for the position he held. However, the

parties dispute whether Cintron has established the third and fourth prongs of a prima facie case of discrimination.

Adverse Employment Action

Cintron argues that he suffered three materially adverse employment actions, including (1) the investigation of his relationship with Villatoro (the second investigation), (2) harassment and questioning by coworkers after the first investigation and throughout the second investigation, and (3) the termination of his employment at Atticus.

Atticus contends that Cintron has failed to produce any evidence of a materially adverse employment action. With regard to Cintron's separation from the company, Atticus maintains that he was not terminated but, rather, he resigned. Cintron, on the other hand, has testified that he told Pustizzi and Negaro Jr. he *might* resign if he continued to be harassed. Cintron testified further that he subsequently told Pustizzi that he was rescinding his previous statement about a resignation. For purposes of ruling on a summary judgment motion, the Court must "resolve[] disputed facts in favor of the non-moving plaintiff where there [is] evidence to support his allegations." *Sousa*, 578 F.3d at 166 n.1. The Court must resolve this disputed fact in favor of Cintron and accept that Atticus terminated his employment. A termination of employment is "sufficiently disadvantageous to constitute an adverse employment action" under Title VII. *Fahrenkrug v.Verizon Services Corp.*, 652 F. App'x 54, 56 (2d Cir. 2016).  The Court finds that when viewing the facts in Cintron's favor, he has presented sufficient evidence to satisfy the third prong of the *McDonnell Douglas* prima facie case.

While Cintron's termination satisfies the requirement of an adverse employment action, the Court does not agree that either the investigation of Cintron's relationship with Villatoro or the questioning and what Cintron characterizes as harassment by other Atticus employees and

management constitutes an adverse employment action under Title VII. The Court finds that the investigation by Atticus of Cintron's relationship with Villatoro was a reasonable response to information that had been presented to the company. Flood, the Atticus Human Resources Manager, had received a call from Cintron's wife informing Flood that Cintron was having a personal relationship with his subordinate Villatoro. Although Atticus did not have a non-fraternization policy in place in 2012[4], it did have a Non-Harassment Policy. With regard to this investigation, Cintron's testimony indicates nothing more than that Atticus asked him whether he was having a personal relationship with someone who worked in the bakery. In light of the possible implications in terms of the Non-Harassment Policy, it was only prudent that Atticus investigate the nature of that relationship. *See Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006 ) ("an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner").

The Court also disagrees that questions and comments by coworkers and management constituted a materially adverse employment action. Courts have found that verbal abuse alone may not rise to the level of an adverse employment action. *See Pomilio v. Wachtell Lipton Rosen & Katz,* 97 Civ. 2230 (MBM), 1999 U.S. Dist. LEXIS 53, at *23-24 (S.D.N.Y. Jan. 6, 1999) ("sarcastic comments, demeaning comments, insults, threats, and intimidation . . . do not constitute adverse employment actions"). Questions by coworkers about the details of the investigations and the reasons Cintron was being called upstairs do not even appear to rise to the level of insults and threats, but rather resemble questions of curious and nosy coworkers. Questioning and persistent gossip by Cintron's coworkers over a relatively short period of time

---

[4] The record indicates that Atticus implemented such a policy in 2014. (Doc. # 33-5, at 4).

cannot reasonably be viewed as a materially adverse employment action. Additionally, Cintron testified at his deposition that once he told employees that he didn't want to talk about the second investigation they stopped directly asking him about the situation, even though "they were talking about it." (Doc. # 33-2, at 197:13-14). To the extent Cintron argues that his managers, such as Flood, "constantly threaten[ed]" that if he was found to be dating someone, he would be terminated, this alleged "verbal abuse" is also insufficient to constitute a materially adverse employment action. (*Id.* at 101:4-6). *See Brennan v. City of White Plains,* 67 F.Supp.2d 362, 374 (S.D.N.Y.1999) ("While verbal abuse might at times be sufficiently severe and chronic to constitute an adverse employment action, such behavior, without more, hardly rises to the level of actionable retaliation"[5]).

Therefore, the Court concludes that Cintron's termination constitutes a materially adverse employment action, but the second investigation and questioning and "harassment" by coworkers and management do not.

## Inference of Discrimination

Recognizing that a plaintiff's burden in establishing a prima facie case under *McDonnell Douglas* is minimal, the Court finds that Cintron has satisfied his burden with respect to the fourth prong of that standard, i.e., circumstances giving rise to an inference of discrimination. "[A]n inference of discrimination . . . arises when an employer replaces a terminated . . . employee with an individual outside the employee's protected class." *Littlejohn v. City of New York*, 795 F.3d 297, 312-13 (2d Cir. 2015); *see also Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) ("a plaintiff has demonstrated an inference of age discrimination and thus established a *prima facie* case . . . where the majority of plaintiff's responsibilities were

---

[5] The Court notes that Title VII anti-retaliation protection is broader than anti-discrimination protection. *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

transferred to a younger co-worker"). Here it is undisputed that Atticus replaced Cintron with a female employee named Rocio Pinos. The Court concludes that Cintron has satisfied his initial burden of establishing a prima facie case of discrimination.

2. Defendant's Legitimate, Non-discriminatory Reason for its Treatment of Cintron

Under *McDonnell Douglas*, if the plaintiff establishes his prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged employment action. A defendant solely has the burden "of production, not persuasion" when articulating its legitimate, non-discriminatory reason for its treatment of Cintron. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

With respect to the termination of Cintron's Atticus employment, Atticus simply argues that Cintron voluntarily resigned and was not terminated. Atticus contends that during the June 12, 2012 meeting between Cintron, Pustizzi, and Negaro Jr., Cintron voluntarily gave his two weeks' notice. Negaro Jr. states that when Cintron did not leave after two weeks, he "reminded him that he had quit and had to leave the premises." (Doc. # 28-1, at 3, ¶ 17).  The Court concludes that Atticus has articulated a legitimate, non-discriminatory reason for the termination of Cintron's employment.

3. Pretext

Under the *McDonnell Douglas* burden-shifting framework, once the defendant articulates a legitimate, non-discriminatory reason for its treatment of the plaintiff, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). On the basis of "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate . . .

reasons for its actions . . . a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Kwan v. Andalex Group, LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see also Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

As discussed above, the Court must view all genuinely disputed material facts in Cintron's favor pursuant to the summary judgment standard. Based on the evidence provided by Cintron, the Court must reject Atticus' argument that Cintron resigned and find that he was terminated and advised by Atticus that his termination was due to the investigation into his relationship with Villatoro. Under these circumstances the Court concludes that this is "one form of circumstantial evidence that is probative of intentional discrimination, and . . .  may be quite persuasive." *Id.*

Besides the fact that the Court must find for purposes of ruling on the motion for summary judgment that the legitimate, non-discriminatory explanation articulated by Atticus is false, the Court again notes that Cintron was replaced by a female employee. *See Kwan*, 737 F3d at 847 ("a plaintiff may rely on evidence comprising [his] prima facie case . . . together with other evidence such as inconsistent employer explanations, to defeat summary judgment"). Additionally, Cintron alleges that female supervisors at Atticus had personal relationships with male subordinates, but were not terminated or disciplined because of those relationships. Cintron mentions Maribel Rodriguez ("Rodriguez"), a female supervisor who had a personal relationship with a male employee, Gabino Aguilar ("Aguilar"). According to Atticus, "Rodriguez is married to another employee of Atticus who does not now report nor at any relevant time has he reported to her." (Doc. # 28-1, at 4, ¶ 21). According to Cintron, however, for the majority of the time he worked at Atticus, Aguilar worked in the same department as

Rodriguez and reported to her. Although it is undisputed that Rodriguez is married to Aguilar, the record does not reflect when the marriage took place relative to when they, according to Cintron, began working in the same department. This circumstantial evidence could provide additional support for the inference that Atticus' legitimate, non-discriminatory reason for the termination of Cintron's employment is both false and at least in part motivated by gender discrimination. The Court finds that Cintron has satisfied his burden of presenting sufficient evidence to support an inference by a reasonable factfinder that Atticus terminated Cintron based on intentional gender discrimination. Therefore, the Court denies Atticus' motion for summary judgment as to Cintron's claim of sex discrimination in violation of Title VII.

### C.  Sex Discrimination in Violation of CFEPA

CFEPA provides in pertinent part that "[i]t shall be a discriminatory practice in violation of this section . . . [f]or an employer . . . to discharge from employment any individual . . . because of the individual's . . . sex . . . ." Conn. Gen. Stat. § 46a-60(a) (1). CFEPA is largely coextensive with Title VII, and in enforcing Connecticut's anti-discrimination statutes, Connecticut courts look to federal precedent by applying the standards used by federal courts in evaluating discrimination claims under Title VII. *See Brittell v. Department of Correction*, 247 Conn. 148, 164 (1998) ("In defining the contours of an employer's duties under our state antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964, the federal statutory counterpart to § 46a-60."). The Connecticut Supreme Court has expressly noted that "the analytical framework set forth . . . in *McDonnell Douglas* . . . is used to determine whether a complainant may prevail on a claim of disparate treatment under our state law." *Department of Transportation v. Commission on Human Rights and Opportunities*, 272 Conn. 457, 464 n.9 (2005).

Since the *McDonnell Douglas* framework applies to Cintron's CFEPA sex discrimination claim, and the Court has already determined that Cintron's Title VII sex discrimination claim satisfies *McDonnell Douglas*, his CFEPA claim likewise satisfies that standard. Accordingly, Atticus' motion for summary judgment is denied as to Cintron's CFEPA sex discrimination claim.

### D.  Hostile Work Environment in Violation of Title VII

Cintron claims that he was subjected to a hostile work environment in violation of Title VII by virtue of the investigation into his relationship with Villatoro and the questioning and harassment he endured as a result of that investigation. Atticus responds that the investigation, which consisted of a single, brief meeting between Cintron and Daukas, falls far short of the standard applicable to a hostile environment claim and was not based on his gender. Likewise, Atticus contends that the questioning Cintron was subjected to was not sufficiently severe or pervasive to establish a hostile work environment and also was not based on his gender.

In order to prove a hostile work environment claim, a plaintiff "must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment"). The Supreme Court has established "standards for judging hostility [that] are sufficiently demanding to ensure that Title VII does not become a general civility code." *Id.* (internal quotation marks omitted).When properly applied, these standards "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id*. (internal quotation marks omitted).

To defeat a motion for summary judgment on a claim of a gender-based hostile work environment under Title VII, a plaintiff must offer evidence from which a reasonable jury could conclude "that the complained-of conduct (1) is objectively severe or pervasive in that it creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristic." *Figueroa v. Johnson*, 648 F. App'x 130, 134 (2d Cir. 2016). A defendant's conduct that is "merely offensive and not severe or pervasive enough to create an objectively hostile or abusive work environment - - an environment that a reasonable person would find hostile or abusive - - is beyond Title VII's purview." *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997) (internal quotation marks omitted). Although there is no precise test for determining what constitutes a hostile work environment, the Court considers the totality of the circumstances, including factors such as the "severity, frequency, and degree of abuse." *Figueroa*, 648 F. App'x at 135.

The Court concludes that the investigation into Cintron's relationship with Villatoro cannot reasonably be found to constitute a hostile work environment under Title VII. The second investigation consisted of a single meeting between Daukas and Cintron that lasted less than five minutes and consisted of Daukas asking Cintron whether he was having a personal relationship with another employee. The Court has already found that the investigation of Cintron's relationship with Villatoro was a reasonable response to information that had been presented to Atticus. Although Cintron subjectively felt offended by the investigation because he was having a permissible relationship, a reasonable juror could not view this investigation as conduct "permeated with discriminatory intimidation . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*

*v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted).

After Cintron was questioned by Daukas and met with Pustizzi and Negaro Jr., he "kept on

working and everything was fine" until he was terminated on June 29, 2012. (Doc. # 33-2, at

132:10-11). Cintron has presented insufficient evidence to establish that the second investigation

created an objectively hostile or abusive work environment in violation of Title VII.

Atticus contends that Cintron's alleged harassment and questioning by coworkers and

managers, consisting of them asking him whether he had sexually harassed someone, also did not

rise to the level of an objectively abusive work environment. Atticus argues that gossip and

rumors around the workplace cannot be deemed sufficiently severe and pervasive to alter the

conditions of Cintron's employment and create a hostile and abusive work environment for

purposes of Title VII.

In opposing the defendant's motion for summary judgment, Cintron argues that he "was

repeatedly and continuously harassed in an attempt to force [him] into divulging details about his

personal relationship with a colleague." (Doc. # 33, at 25-26). He goes on to contend that the

"constant harassment, questioning, and badgering of Plaintiff . . . was extremely disruptive,

rising to the level of materially adverse." (*Id*. at 27).When asked at his deposition "who said

what to you and who did what to you . . . after the second investigation" that caused him to feel

that he was being harassed, Cintron responded as follows:

> I don't recall the people. It was just a lot of people. I just don't recall.
> That's my final answer. I don't recall the people exactly. I just know that
> it was very tormenting to me as a person that everybody was looking down
> on me like I did something wrong. I felt very small. I felt that I was being
> prosecuted from everybody from every different angle, management,
> employees. That's the way I felt and that's the only way I can explain it
> to you. I don't have any other way of explaining it to you.

(Doc. # 33-2, at 143:14-16, 20-25; 144:1-5).

19

Cintron's response when asked who said and did what to him after he met with Daukas was quite general and vague. The specific questions Cintron recalled being asked were why he had been summoned to meet with Daukas and whether he had sexually harassed anyone. These were objective questions about the details of the investigation and a reasonable juror could not view this as conduct "permeated with discriminatory intimidation . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (1993) (internal quotation marks and citation omitted). Additionally, Cintron testified that when he asked his coworkers to stop asking him questions, they stopped questioning him directly, but continued to talk among themselves. The Court further finds that these questions were, on their face, gender neutral. The Second Circuit has stated, "it is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of [his] sex." *Desardouin v. Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (internal quotation marks omitted). Cintron has failed to show that the questions by other Atticus employees were based upon his sex and would thus appropriately fall under Title VII.

For these reasons, Atticus' motion for summary judgment is granted as to Cintron's claim of a hostile work environment in violation of Title VII.

### E.  Aiding and Abetting in Violation of Conn. Gen. Stat. § 46a-60(a)(5)

Cintron also raises a claim of aiding and abetting in violation of CFEPA. Pursuant to Conn. Gen. Stat. § 46a–60(a)(5), it is a discriminatory practice "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to attempt to do so."

20

Atticus argues that Cintron's aiding and abetting claim should be dismissed because an employer may not be held liable under Connecticut law for aiding and abetting its own discriminatory conduct. *See Farrar v. Town of Stratford*, 537 F. Supp. 2d 332, 356 (D. Conn. 2008) (internal quotation marks omitted)  ("The law in Connecticut is clear that while an individual employee may be held liable for aiding and abetting his employer's discrimination, an employer cannot be liable for aiding and abetting its own discriminatory conduct."). Cintron counters with the argument that Negaro Jr. wrongfully terminated him and Flood constantly threatened him, thereby illegally aiding and abetting Atticus' discrimination against him.

The Court concludes that Cintron's aiding and abetting claim under CFEPA must fail. Negaro Jr. and Flood are not named defendants in this case and therefore, liability cannot be imposed against them. In *Farrar,* this Court stated, "A plaintiff may seek recovery from individual . . .  employees for illegally aiding and abetting discrimination against him, should he choose to file an independent lawsuit or to join those parties as defendants to this action." *Id.* (internal quotation marks omitted). Cintron only names Atticus as a defendant in this action. Cintron's sole remedy for Atticus' conduct lies in the stated claims of gender discrimination presented in his complaint. Since Atticus cannot aid and abet itself in its own discriminatory conduct, Cintron's aiding and abetting claim is insufficient.

For these reasons, Atticus' motion for summary judgment is granted as to Cintron's claim of aiding and abetting in violation of CFEPA.

**E. Invasion of Privacy by Unreasonable Intrusion Upon the Seclusion of Another**

Cintron raises a common law claim of invasion of privacy by unreasonable intrusion upon the seclusion of another. Cintron claims that when Atticus conducted the investigation into his personal relationship with Villatoro, it invaded his privacy. Further, Cintron argues that Atticus unreasonably intruded upon his seclusion when Negaro Jr. and Pustizzi continuously harassed him about the details of his personal relationship.

Atticus argues that summary judgment should be granted in its favor on the claim of invasion of privacy because Cintron's claims cannot reasonably be construed to be highly offensive to a reasonable person. Atticus contends that the second investigation consisted of one meeting, where Daukas asked Cintron about the existence of his personal relationship with Villatoro, and that any questions he endured regarding the investigation cannot reasonably be perceived as intentionally interfering with his solitude.

Connecticut common law recognizes four distinct categories of invasion of privacy, one of which is "unreasonable intrusion upon the seclusion of another." *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 128 (1982). "Connecticut courts have interpreted this version of the tort [i.e., unreasonable intrusion upon the seclusion of another] as the intentional invasion upon the solitude or seclusion of another or his private affairs or concerns . . . . if the intrusion would be highly offensive to a reasonable person." *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010) (internal quotation marks omitted).

The Court finds that Cintron's claims do not rise to the level of intrusion that Connecticut courts have determined to be required to establish a claim of invasion of privacy. For example, in *Marrero v. Mega Communications, LLC*, CV000803888, 2003 Conn. Super. LEXIS 2041 (Conn. Super. Ct. July 16, 2003), the plaintiffs were coworkers who had entered into a romantic

22

relationship. In their complaint, these plaintiffs raised invasion of privacy claims based on their allegations that the defendant met with them on several occasions and asked "'highly personal questions' about the nature of their relationship," and subsequently terminated one of the plaintiffs and requested that the other plaintiff either resign or transfer to a different location. *Id.* at *1. The court in *Marrero* found that the plaintiffs' invasion of privacy claims were legally insufficient: "although the plaintiffs allege that the defendant's agents asked them 'highly personal questions' concerning their relationship, they fail to allege the details of the 'highly personal questions' they were asked or to otherwise support a claim that defendant's conduct would be considered 'highly offensive' to the reasonable person." *Id.* at *5.

Here the Court has already determined that the investigation by Atticus of Cintron's relationship with Villatoro was a reasonable response to information that had been presented to the company. Additionally, Cintron testified at his deposition that the only question he was asked by Daukas, who was conducting the investigation, was whether Cintron was having a personal relationship with someone who worked in the bakery. This question, which Cintron refused to answer, was a legitimate inquiry based on the information provided to Flood by Cintron's wife. This legitimate and reasonable inquiry falls far short of "'highly personal questions or demands by a person in authority [that] may be regarded as an intrusion on psychological solitude or integrity and hence an invasion of privacy.'" *Gallagher v. Rapoport*, CV 960149891S, 1997 Conn. Super. LEXIS 1190, at *6 (Conn. Super. Ct. May 6, 1997) (quoting W. Prosser & W. Keeton, Torts (5th Ed. Supp. 1988) 177, p. 121).

Cintron also alleges that "Charles Negaro, Jr. and Chris Pustizzi continued to harass Cintron in an attempt to get him to divulge further information regarding Cintron's personal life." (Doc. # 33, at 27). In his Local Rule 56 (a)2 Statement, Cintron cites to his deposition testimony to

support that allegation. (Doc. # 33-1, at 14, ¶ ¶ 25-27). As the Court previously noted, Cintron

provided a vague response when asked who said and did what to him after he met with Daukas:

"I don't recall the people. It was just a lot of people. I just don't recall. That's my final answer."

(Doc. # 33-2, at 143:20-22). The evidence Cintron relies upon does not support his contention

that after he met with Daukas, Negaro, Jr. and Pustizzi harassed him in an effort to have him

divulge information about his personal life. In any case, the Court finds that Cintron's allegations

of repeated questions by other Atticus employees as to why he was being questioned and

whether he had sexually harassed someone do not rise to the level of an unreasonable intrusion

upon the seclusion of another. *See Kindschi v. City of Meriden*, CV 064022391, 2006 Conn.

Super. LEXIS 3666, at *9 (Conn. Super. Ct. Nov. 28, 2006) (claims that an Assistant Chief

"insinuated that the plaintiff [firefighter] was carrying on an extra-marital affair" and "reported

that the plaintiff had a reputation as a womanizer . . . [were] too imprecise to base an intrusion

upon seclusion cause of action on").

For these reasons, Atticus' motion for summary judgment is granted as to Cintron's claim of

invasion of privacy by unreasonable intrusion upon the seclusion of another.

### III.    CONCLUSION

For the foregoing reasons, Atticus' motion for summary judgment (**doc. #28**) is

**GRANTED** in part and **DENIED** in part.

The motion for summary judgment is granted as to the claims of hostile work environment in

violation of Title VII (Count Two); aiding and abetting discrimination in violation of Conn. Gen.

Stat. § 46a – 60(a)(5) (Count Four); and invasion of privacy by unreasonable intrusion upon the

seclusion of another (Count Five).

The motion for summary judgment is denied as to the claims of discrimination on the basis of sex in violation of Title VII (Count One); and discrimination on the basis of sex in violation of CFEPA (Count Three). The case will proceed as to these two claims.

SO ORDERED this    16th      day of March,  2017.

_____/s/  DJS_____
                     Dominic J. Squatrito
                United States District Judge

25